UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------X
COASTAL DISTRIBUTION, LLC and THE
NEW YORK AND ATLANTIC RAILWAY COMPANY,

                    Plaintiffs,

        – against –                        <u>MEMORANDUM AND ORDER</u>
                                           05-CV-2032(JS)(ETB)

THE TOWN OF BABYLON, A MUNICIPAL
CORPORATION, THE TOWN OF BABYLON
BOARD OF ZONING APPEALS, PETER
CASSERLY, AS COMMISSIONER OF
PLANNING AND DEVELOPMENT OF THE TOWN
OF BABYON, and PINELAWN CEMETARY,

                    Defendants.
-----------------------------------X
Appearances:
For Plaintiffs:

Coastal Distribution, LLC        James F. Gaughran, Esq.
                                 191 New York Avenue
                                 Huntington, New York 11743

                                 John F. McHugh, Esq.
                                 6 Water Street
                                 New York, New York 10004

                                 Ronald E. Joseph, Esq.
                                 Landman Corsi Ballaine & Ford
                                 120 Broadway
                                 New York, New York 10271

The New York & Atlantic
Railway Company                  Ronald E. Joseph, Esq.
                                 Landman Corsi Ballaine & Ford
                                 120 Broadway
                                 New York, New York 10271

                                 Ronald A. Lane, Esq.
                                 Fletcher & Sippel LLC
                                 29 North Wacker Drive
                                 Chicago, Illinois 60606-2832


For Defendants:

The Town of Babylon,

a municipal corporation,
The Town of Babylon Board
of Zoning Appeals, Peter
Casserly, as Commissioner of
Planning and Development of
the Town of Babylon, and
Pinelawn Cemetery

James Patrick Clark, Esq.
Bond Schoeneck & King PLLC
1399 Franklin Avenue
Garden City, New York 11530

Mark A. Cuthbertson, Esq.
434 New York Avenue
Huntington, New York 11743

SEYBERT, District Judge:

Before this Court is Magistrate Judge E. Thomas Boyle's
Report and Recommendation regarding the request of Coastal
Distribution, LLC ("Coastal") and the New York & Atlantic Railway
("NYA" and together with Coastal, the "Plaintiffs") for a
preliminary injunction. The Magistrate recommended that this Court
preliminarily enjoin the Town of Babylon ("Town") from enforcing
its Stop Work Order and certain zoning regulations against the
Plaintiffs. Pursuant to FED. R. CIV. P. 72(b), the Town and
Pinelawn Cemetery ("Pinelawn" and together with the Town, the
"Defendants") objected to parts of the Report and Recommendation,
and Plaintiffs responded. Pursuant to 28 U.S.C. § 636(b)(1), this
Court reviews <u>de</u> <u>novo</u> those portions of the Report and
Recommendation to which Defendants object. Such <u>de</u> <u>novo</u> review
does not entirely replace the Magistrate's efforts. For purposes
of this review, familiarity with the facts of the case is presumed.

After carefully reviewing Defendants' objections, this

-2-

Court adopts the Report and Recommendation and grants Plaintiffs' request for a preliminary injunction.  First, <u>Younger</u> does not apply in this case nor will this Court give preclusive effect to the Babylon's Zoning Board of Appeals' ("ZBA") findings of fact. Second, after reviewing the harm to the public interest, this Court finds that Plaintiffs have met their burden on their request for a preliminary injunction.

DISCUSSION

I.   <u>The Younger Doctrine Does Not Mandate Abstention Nor Are The ZBA's Findings of Fact Entitled To Preclusive Effect.</u>

A.   <u>No State Proceeding Is Ongoing For Younger.</u>

The <u>Younger</u> doctrine of abstention does not require this Court to abstain from exercising jurisdiction over this action. The <u>Younger</u> doctrine restrains federal courts from exercising jurisdiction over federal constitutional claims where state proceedings are ongoing.  <u>See</u> <u>Younger v. Harris</u>, 401 U.S. 37, 43—44, 27 L. Ed. 2d 669, 91 S. Ct. 746 (1971).  This doctrine is rooted in notions of federalism and the state courts' adequate ability to vindicate federal constitutional rights.  <u>See</u> <u>Cullen v. Fliegner</u>, 18 F.3d 96, 103 (2d. Cir. 1994) (citations omitted). <u>Younger</u> is invoked when state criminal, civil, or administrative proceedings are ongoing.  <u>See</u> <u>Ohio Civil Rights Comm'n v. Dayton Christian Schs., Inc.</u>, 477 U.S. 619, 627, 91 L. Ed. 2d 512, 106 S. Ct. 2718 (1986).  The administrative proceedings, however, must be of a judicial nature.  <u>See</u> <u>Haw. Hous. Auth. v. Midkiff</u>, 467 U.S.

-3-

229, 239, 81 L. Ed. 2d 186, 104 S. Ct. 2321 (1984).

Aside from an ongoing state proceeding, <u>Younger</u> requires two other conditions.  The ongoing state proceeding must implicate an important state interest.  Additionally, that state proceeding must give parties an adequate opportunity for judicial review of federal constitutional claims.  <u>See</u> <u>Diamond "D" Constr. Corp. v. McGowan</u>, 282 F.3d 191, 198 (2d. Cir. 2002) (citations omitted).

In this case, New York law does not expressly state whether the ZBA hearings are judicial or administrative in nature. New York limits, however, ZBA's powers to review only <u>administrative</u> officials' decisions.  N.Y. TOWN LAW § 267-b(1) (the ZBA will have the power to review those decisions made by an "<u>administrative</u> official charged with the enforcement of such ordinance or local law.") (emphasis added).  Pinelawn claims that the ZBA acts in a judicial capacity, but Pinelawn cites to only one case that finds zoning appeals as merely "quasi-judicial." (Pinelawn's Objections to Report and Recommendation at 28.)

The nature of zoning appeals, however, is irrelevant because no zoning appeal is pending.  The ZBA rendered a final decision regarding this case on February 10, 2005.  <u>See</u> <u>Coastal Distribution, LLC</u>, Application No. 04-267 (Town of Babylon Zoning Board of Appeals, Feb. 10, 2005).  At that point, Plaintiffs were free to initiate an Article 78 proceeding in state court, but no state law requires this.  <u>See</u> N.Y. VILLAGE LAW § 7-712-c ("Any person

-4-

. . . aggrieved by any decision of the board of appeals . . . <u>may</u> apply to the supreme court for review by a proceeding under article seventy-eight of the civil practice law and rules.") (emphasis added).

So as to the first <u>Younger</u> condition, no state court judicial proceeding was ongoing at the time this action commenced. At best, a quasi-judicial proceeding had terminated two months before Plaintiffs filed their complaint. In light of the fact that no state proceeding is ongoing, this Court will not address the other <u>Younger</u> conditions and may exercise jurisdiction over this action.

B.    <u>This Court Will Not Give Preclusive Effect To The ZBA's Findings Of Fact.</u>

Defendants also argue that the Magistrate was bound by the ZBA's findings of fact and conclusions of law. This Court disagrees and finds that the Magistrate properly made his findings of fact and conclusions of law. Furthermore, the ZBA's findings bind neither this Court nor that of the Magistrate.

The Supreme Court held that federal courts must give preclusive effect to agencies that act in a "judicial capacity." <u>Univ. of Tenn. v. Elliott</u>, 478 U.S. 788, 799, 106 S. Ct. 3220, 92 L. Ed. 2d 635 (1986). But as already established, the ZBA does not act in a judicial capacity. Moreover, in an Article 78 proceeding, a state court can conduct its own hearing, hear further evidence and testimony, and draw its own findings of fact and conclusions of

law. These findings and conclusions become a part of the proceeding upon which a state court can make a decision regarding the ZBA's final determinations. See N.Y. TOWN LAW § 267-c(4) (discussing the power of the court in an Article 78 proceeding). A fortiori, a federal court can conduct its own hearing, hear further evidence and testimony, and draw its own findings of fact and conclusions of law while reviewing a case that has been before the ZBA.

II. The Plaintiffs Have Met Their Burden For This Court To Grant A Preliminary Injunction.

For this Court to issue a preliminary injunction against "government action taken in the public interest pursuant to a statutory or regulatory scheme," the Plaintiffs must show "(i) irreparable harm absent the injunction and (ii) a likelihood of success on the merits." Freedom Holdings, Inc. v. Spitzer, 408 F.3d 112, 114 (2d Cir. 2005) (citations omitted). Plaintiffs satisfy the irreparable harm requirement when they show that absent a preliminary injunction, Plaintiffs "will suffer 'an injury that is neither remote nor speculative, but actual and imminent,' and one that cannot be remedied 'if a court waits until the end of trial to resolve the harm.'" Id. Because irreparable harm is "the single most important prerequisite" before a preliminary injunction will issue, Plaintiffs must show first that the injury is "likely" before showing any other requirements. Id.

A. Absent Injunctive Relief, Plaintiffs Will Suffer

-6-

<u>Irreparable Harm.</u>

Irreparable harm does not exist when money damages can fully compensate a party for its injuries caused by the absence of a preliminary injunction. <u>See</u> <u>Register.com, Inc. v. Verio, Inc.</u>, 356 F.3d 393, 404 (2d Cir. 2004); 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, <u>Federal Practice and Procedure</u> § 2948.1 (2d ed. 1995). However, when courts cannot establish and measure the injury in terms of money, courts have found irreparable harm. <u>See</u> <u>Register.com, Inc.</u>, 356 F.3d at 393. Loss of goodwill and injury to reputation are injuries that are difficult to measure in dollars, and thus, these types of injuries are irreparable harm. <u>See</u> Wright, Miller & Kane, <u>supra</u> § 2948.1. Furthermore, loss of business opportunities and relationships with clients who could "produce an indeterminate amount of business over years to come" are also hard to measure in dollars and are properly considered irreparable harm. <u>See</u> <u>Register.com, Inc.</u>, 356 F.3d at 393.

Defendants argue that nothing in the record supports a finding of irreparable harm; specifically, the record arguably does not establish any loss of goodwill, reputation, or business opportunities. Plaintiffs refute this. Coastal lost potential clients because of this matter and without an injunction, the Farmingdale facility will likely shut down. Without the ability to provide long-term service, Coastal cannot ask shippers to abandon their relationships with truckers. Furthermore, Plaintiffs did not

construct any new structures for construction and demolition debris ("C&D") materials until after both Defendants had assured them that construction was approved.

The irreparable harm is apparent in this case. NYA is the only railroad that handles rail freight on the Long Island Railroad rails. (Hearing Transcript Before Magistrate Judge Boyle, May 19, 2005 ("Tr.") 25.) NYA's growth is almost entirely dependent on transloading. (Tr. 30.) The Farmingdale facility is NYA's only facility suitable for bulk commodities, and Coastal is the only operator of that transload facility. (Tr. 33—34.) Shutting down the Farmingdale facility would result in a loss of business opportunities, goodwill, and reputation for NYA.

Plaintiffs' rail services are integral for transporting freight and other materials in and out of Long Island. Coastal's clients need these transload and rail services because once the clients commit to rail transportation, it is hard to re-establish trucking arrangements. (Tr. 183—84.) Coastal has already held off accepting clients because Coastal cannot reassure these potential clients that Coastal will be there long term. Id. If the Plaintiffs cannot offer the public long-term, reliable, and well-needed transload and rail services, the Plaintiffs will lose current and potential clients, goodwill, reputation, and an indeterminate amount of business over years to come - immeasurable in dollar amount. Id. These types of injuries constitute

irreparable harm in this Circuit and the Court holds accordingly.

B.    A Preliminary Injunction Benefits The Public Interest.

Defendants correctly argue that when a preliminary injunction implicates public interests, a court should consider the balance of such interests in deciding if "a plaintiff's irreparable injury and probability of success on the merits warrants injunctive relief." Brody v. Vill. of Port Chester, 261 F.3d 288, 290 (2d Cir. 2001). Defendant Pinelawn Cemetery ("Pinelawn") argues that the public interest would be harmed if the Town could not regulate the Plaintiffs while handling substances dangerous to the public, specifically asbestos, lead, and other hazardous materials released into the air. But this Court finds that the public interest of reducing trucking traffic on already-congested highways the true interest of concern.

Even though the Interstate Commerce Commission Termination Act ("ICCTA") preempts the states from regulating railroads, the states may still exercise "traditional police powers over the development of railroad property." Green Mountain R.R. Corp. v. Vermont, 404 F.3d 638, 643 (2d Cir. 2005). Such state regulations must "protect public health and safety, [be] settled and defined, . . . obeyed with reasonable certainty, and . . . approved (or rejected) without the exercise of discretion on subjective questions." Id. Thus, any "electrical, plumbing and fire codes, direct environmental regulations enacted for the public

health and safety" would withstand preemption. Plaintiffs then would not go unregulated in regard to utilities, the environment, and the public's health and safety.  Id.

Thus, the sole public interest at issue here is the highway and road congestion that would dramatically increase if this Court did not enjoin the Town.  If this Court does not enjoin the Town from enforcing the Stop Work Order, Plaintiffs' clients would have to transport its freight and other materials via truck on already-congested highways.  This flies in the face of the very reason New York State privatized rail freight in the first place. The Governor wanted to decrease the number of trucks on the roads and place that traffic on underutilized rails.  (Tr. 28.)  Without an injunction, hundreds of trucks will be forced onto the Long Island Expressway and other already-congested highways and roads. (Tr. 73.)  Therefore, this Court serves the public interest of minimizing highway congestion due to trucks by preliminarily enjoining the Town from enforcing the Stop Work Order.

C.  <u>Plaintiffs Have Shown A Likelihood Of Success On The Merits.</u>

The second prong that Plaintiffs must meet for this Court to issue a preliminary injunction is likelihood of success on the merits.  <u>See</u> <u>Freedom Holdings, Inc.</u>, 408 F.3d at 114.  For purposes of a preliminary injunction, however, this Court need not find with "absolute certainty" that Plaintiffs will succeed on the merits of their claims.  <u>Wali v. Coughlin</u>, 754 F.2d 1015, 1025 (2d Cir. 1984)

("A movant . . . need not show that success is an absolute certainty. He need only make a showing that the probability of his prevailing is better than fifty percent. There may remain considerable room for doubt.") Thus, a finding that Plaintiffs have more than a fifty-fifty chance of succeeding on the merits of their claims would warrant a finding of a likelihood of success on the merits.

Plaintiffs argue that the Town cannot regulate Coastal's construction of a shed because ICCTA preempts state law and has exclusive jurisdiction over railroads. Based on the reasoning below, this Court finds that the Plaintiffs provide railroad transportation, NYA is a rail carrier, and Coastal is likely a rail carrier, resulting in ICCTA's exclusive jurisdiction over the Plaintiffs.

1. Coastal's Transload Services Are Transportation Under ICCTA Jurisdiction.

The Second Circuit faced facts and issues similar to those presented in this case. See Green Mountain, 404 F.3d at 638. In Green Mountain, the Second Circuit found that ICCTA preempted Vermont's environmental land use statute. Vermont attempted to regulate the plaintiff railroad company. The railroad wanted to construct a shed to store bulk salt, bulk cement, and non-bulk goods such as steel pipes. The state notified the railroad that constructing the shed violated the railroad's construction permits.

The Second Circuit cited ICCTA, which expressly preempted

-11-

"remedies under Federal or State law" and vested with the "Surface Transportation Board [("STB")], a federal agency, exclusive jurisdiction over 'transportation by rail carriers' and 'the construction . . . of . . . facilities . . . '" for the rail carriers.  Id. at 639 (citing 49 U.S.C. § 10501(b)).  The Second Circuit noted that "[t]he term 'transportation' is expansively defined to include a 'warehouse . . . yard, property, facility, instrumentality, or equipment of any kind related to the movement of passengers or property, or both, by rail.'" Id. at 642 (citing 49 U.S.C. § 10102(9) (emphasis added)).  The court went on to state that the statute's "plain language grants the [STB] wide authority over [the railroad's] transloading and storage facilities."  Id. (citations omitted).

        Based on this expansive reading of ICCTA and the STB's wide reach, the Second Circuit held that Vermont could not regulate the railroad's building of a storage shed through state permit or pre-clearance requirements.  The "proposed transloading and storage facilities are integral to the railroad's operation and are easily encompassed within the [STB's] exclusive jurisdiction over 'rail transportation.'" Id. at 644—45.

        Constructing facilities designed for transloading and storage of materials to be shipped by rail falls within the exclusive jurisdiction of the STB.  Plaintiffs' proposed storage shed for C&D materials to be shipped by rail is exactly the type of

activity the Second Circuit has held falls within ICCTA and STB jurisdiction. The construction of the storage shed is integral to Plaintiffs' shipment of C&D materials by rail. Thus, ICCTA preempts state and town law, and the Town cannot prohibit Plaintiffs from constructing its storage shed.

Defendant Pinelawn attempts to distinguish <u>Green Mountain</u> from the case at hand. In <u>Green Mountain</u>, Vermont attempted to regulate the railroad that owned the transload facility; in this case, the Town attempts to regulate Coastal, an entity which contracted with the railroad, NYA, to operate the transload facility in Farmingdale. But in defining transportation, Congress did not draw a distinction between a railroad and a party it contracts with. <u>See</u> 49 U.S.C. § 10102(9)

> "[T]ransportation" includes --
> (A) a locomotive, car, vehicle, vessel, warehouse, wharf, pier, dock, yard, property, facility, instrumentality, or equipment of any kind related to the movement of passengers or property, or both, by rail, <u>regardless of ownership or an agreement concerning use</u>; and
> (B) services related to that movement, including receipt, delivery, elevation, transfer in transit, refrigeration, icing, ventilation, storage, handling, and interchange of passengers and property . . . .

<u>Id</u>. (emphasis added).

Thus, by its plain language, Coastal's transloading facility falls within the definition of transportation. Transportation includes any yard, property, or facility, and services related to the movement of property by rail - no matter whether the railroad owns and operates the facility or contracts with a third party to

operate that facility.

Furthermore, if the Court was to accept Defendants' argument, preemption of state regulations would occur only when the railroads are the sole owners and operators of a transload facility. Inconsistency would result. Railroad-owned and operated transload facilities would be regulated under ICCTA. But transload facilities operated by third parties contracting with a railroad would be subject to Town regulations even though all those transload facilities provided the same exact services. To avoid this absurd result, all transload facilities related to the movement of passengers and property by rail - whether controlled by a railroad or not - are transportation.

The Third Circuit case of <u>Hi Tech Trans, LLC v. N.J. Dep't of Evntl. Prot.</u>, 382 F.3d 295 (3d Cir. 2004) does not control this case. The <u>Hi Tech</u> court found that Hi Tech, a lessor of a facility, was transporting materials "to" a rail carrier, and Hi Tech's operations did not involve transportation "by" rail carrier. <u>Id</u>. at 308. Accordingly, ICCTA and the STB did not preempt state law, and Hi Tech was subject to New Jersey's Municipal Solid Waste Laws. <u>See id</u>. at 309.

Some facts in this case differ materially from <u>Hi Tech</u>. First, the New York State Department of Environmental Conservation ("NYDEC") - New York's equivalent to the state agency involved in the <u>Hi Tech</u> case - visited the facility Coastal operates. NYDEC,

which has more experience in assessing the type of facility that is being operated than any court of federal jurisdiction has, found that Coastal transloads materials on behalf of NYA, that the Farmingdale facility is a transload facility, and that NYDEC is preempted from exercising jurisdiction over such facility. (Rutigliano Decl. Ex. I.) The state agency in <u>Hi Tech</u> found the exact opposite to be true. The New Jersey State Department of Environmental Protection ("NJDEP") found that Hi Tech was operating a municipal solid waste facility subject to state laws.

This Court notes that Defendants attempt to downplay the importance of NYDEC's findings that Coastal is operating a transload facility. But in the <u>Hi Tech</u> case, upon which the Defendants heavily rely, the Third Circuit discussed at length the NJDEP's findings and New Jersey's interest in regulating municipal solid waste facilities. <u>See id</u>. at 299—301, 309 ("New Jersey's interest in regulating its solid waste disposal facilities is as real as it is critical."). The Third Circuit went on to find that New Jersey has a "well-recognized compelling state interest" in regulating "solid waste facilities in a densely populated state that has suffered the scourge of unregulated solid waste facilities for decades." <u>Id</u>. at 309 (agreeing with the findings of the district court). No parallel state interest lies in this case because the NYDEC found that Coastal operates a transload facility under ICCTA jurisdiction. As the Third Circuit paid great heed to

NJDEP's findings, so too does this Court heed the findings of NYDEC.

Another distinction between Hi Tech and this case is the relationship between the railroad and the entity operating the facility. In this case, NYA and Coastal jointly agree and argue that they have an agency relationship. In Hi Tech, neither the railroad nor Hi Tech argued that they had an agency or employment relationship.

The Hi Tech court found that the agreement between Hi Tech and the railroad "essentially eliminate[d the railroad's] involvement in, and responsibility for, the operation of Hi Tech's facility." Hi Tech, 382 F.3d at 308. The Coastal-NYA operations agreement at issue in this case does not essentially eliminate the railroad's involvement in and responsibility for the operation of the Farmingdale facility. In fact, the Coastal-NYA operations agreement states that the "RAILROAD shall control the Facility's operations" and have the right to review and audit Coastal's records and inspect Coastal's facility. (NYA Ex. 8 ¶1.02) The Coastal-NYA operations agreement further provides that (1) NYA must approve all of Coastal's "commodities, movements, and equipment," (2) NYA must pre-approve any of Coastal's written marketing materials, and (3) written marketing materials must prominently indicate NYA's name or logo. (NYA Ex. 8 ¶1.04.) Coastal also must pass a portion of its loading fees to NYA and increase levels of

traffic. (NYA Ex. 8 ¶¶3.02, 5.01.)

Thus, the operations agreement does not essentially eliminate NYA's involvement and responsibility for the Farmingdale facility. The agreement does quite the opposite and involves NYA on many levels. <u>Hi Tech</u> is thus distinguished from the case at hand and is not dispositive.

Defendants argue that an agency relationship does not exist between Coastal and NYA. But this Court finds an agency relationship unnecessary to find ICCTA jurisdiction. First, by its plain language, ICCTA allows railroads to contract with other entities to supervise the facilities and yards related to the movement of property by rail. ICCTA does not expressly require such contractual relationship to be one of agency. <u>See</u> 49 U.S.C. § 10102(9)(A). Second, the NYDEP found the Farmingdale facility to be a transloading facility subject to ICCTA jurisdiction. (Rutigliano Decl. Ex. I.) Third, Second Circuit case law has held that ICCTA has exclusive jurisdiction over transload and storage facilities like the Farmingdale facility. <u>See</u> <u>Green Mountain</u>, 404 F.3d at 644. Fourth, this Court finds that NYA's involvement at the Farmingdale facility is enough to bring the facility within the exclusive jurisdiction of ICCTA, regardless of Coastal's agreement to actually operate the facility.

2. <u>Coastal Is Likely A Rail Carrier Under ICCTA Jurisdiction.</u>

The other element required for ICCTA jurisdiction is that

the transportation be provided by "rail carrier." 49 U.S.C. § 10501(a)(1)(A) (". . . [T]he Board has jurisdiction over transportation by rail carrier . . . ."). Defendant Pinelawn argues that the term "rail carrier" does not include third parties who contracted with railroads to operate transload facilities. But the Defendants do not refute this Circuit's precedent nor Supreme Court precedent nor that of the STB. The Second Circuit did not address specifically whether a contractor operating transload facilities falls under ICCTA jurisdiction; the Second Circuit, however, did hold that transload and storage facilities themselves are transportation and do fall under ICCTA jurisdiction. See Green Mountain, 404 F.3d at 642.

Furthermore, the Supreme Court addressed whether the definition of "rail carrier" includes contracted third parties who provide transfer services for railroads. See City of Chicago v. Atchison, Topeka, & Santa Fe Ry. Co., 357 U.S. 77, 87–89, 78 S. Ct. 1063, 2 L. Ed. 2d 1174 (1958). The Supreme Court interpreted ICCTA's predecessor, the Interstate Commerce Act, to have jurisdiction over a third-party private bus corporation that contracted with the railroads to provide transfer services for passengers between train terminals. This Supreme Court precedent supports Plaintiffs' proposition that ICCTA has jurisdiction over third parties who contract with railroads and provide integral services to those railroads.

The Act provides that motor vehicle transportation between terminals, <u>whether performed by a railroad or by an agent or a contractor of its choosing, shall be regarded as railroad transportation</u> and shall be subject to the same comprehensive scheme of regulation which applies to such transportation. The various provisions set forth above manifest a congressional policy to provide for the smooth, continuous and efficient flow of railroad traffic from State to State subject to federal regulation. In our view it would be inconsistent with this policy if local authorities retained the power to decide whether the railroads or their agents could engage in the interterminal transfer of interstate passengers. We believe the Act authorizes the railroads to engage in this transfer operation themselves or to select such agents as they see fit for that purposes without leave from local authorities. . . . Because of close time schedules, the great volume of traffic and its irregular ebb and flow, the railroads obviously need a cooperative and dependable transfer operator with suitable equipment who is willing to work in close harmony with them. . . . <u>[T]he City has no power to decide whether [the contracted third party] can operate a motor vehicle service between terminals for the railroads because this service is an integral part of interstate railroad transportation authorized and subject to regulation under the Interstate Commerce Act</u>.

<u>Id</u>. (emphasis added).

Lastly but perhaps most telling are certain STB decisions that determine rail carrier status of parties who contract with railroads. <u>See</u> <u>Ass'n of P&C Dock Longshoremen v. Pittsburgh & Conneaut Dock Co.</u>, 8 I.C.C. 2d 280 (1992); <u>H&M Int'l Transp., Inc.</u>, Petition for Declaratory Order, STB Finance No. 34277, 2003 STB LEXIS 722 (Nov. 12, 2003). STB's predecessor, the Interstate Commerce Commission ("ICC"), determined that a dock facility that contracted with a railroad and provided loading operations for coal and iron ore was a rail carrier. In <u>Ass'n of P&C Dock</u>

Longshoremen, the ICC reviewed Commission and court precedent for the criteria needed for an entity to be considered a rail carrier.

The ICC found the following considerations to be relevant: (1) "actual performance of rail service," (2) "the service being performed is part of the total rail service contracted for by a member of the public," (3) "the entity is performing as part of a system of interstate rail transportation by virtue of common ownership between itself and a railroad or by contractual relationship with a railroad, and hence such entity is deemed to be holding itself out to the public," and (4) "remuneration for the services performed is received in some manner, such as a fixed charge from a railroad or by a percent of the profits from a railroad." Id. at 290.

After reviewing these considerations, the ICC laid out a two-part test for whether an entity is a rail carrier. First, does the entity conduct rail operations? Second, does the entity "hold out that service to the public?" Id. at 291. In applying this two-part test, the ICC found that the dock satisfied both tests. In answering the first question, the ICC found that "loading and unloading, performed under contract to a rail carrier, is railroad transportation service. . . . [I]t is within the broad scope of services--receipt, handling, storage, transfer, and interchange-- related to transporting property that, when performed over track with rail equipment, clearly comprises railroad transportation

-20-

under § 10102." Id. at 291.

  As to the second question, the ICC looked to whether the entity, whose rail carrier status was at issue, allowed the public to use the facilities or if it only served the railroad. The test is whether "the questioned service is part of the total rail common carrier service that is publicly offered . . . whether through common ownership or contract." The ICC found that the railroad publicly offered the dock's rail-lake vessel loading and unloading services as part of its complete common carrier rail transportation service. The ICC also found that the dock's service was not restricted to certain classes of railroad traffic or specific railroad shippers. The dock services were available to all that engage the railroad. See 294—95.

  Ultimately, the ICC held that the dock was a rail carrier. The dock "conduct[ed] rail operations – it operates a dock that uses rail equipment and track to receive, interchange, transfer, store, and handle property that is being transported –– and makes that service publicly available to all who employ the [railroad]. . . ." Id. at 295.

  Applying the ICC's two-part test to the facts of this case, this Court finds that Coastal is likely a rail carrier and is under the exclusive jurisdiction of ICCTA. The first question of the test – whether Coastal's services are part of rail operations – is answered in the affirmative. Coastal operates a transload

facility; Coastal loads and unloads materials performed under contract with a rail carrier. Coastal receives the freight and other materials from trucks, it handles the freight, it stores the freight until Coastal loads the materials onto the train cars. Tr. at 33, 228. Clearly, Coastal's services are properly considered "transportation" under 49 U.S.C. § 10102 and accordingly are a part of rail operations.

The Court also believes the second question should be answered in the affirmative -- as to whether Coastal holds its services out to the public as part of the total rail carrier services provided at the Farmingdale facility. The record reveals that both Coastal and NYA work together at the Farmingdale facility. (Tr. 176–77.) Coastal is in charge of marketing and customer relations. (Tr. 99, NYA Ex. 8 ¶1.04.) NYA sets the rules governing how loading is performed and whether the loaded cars comport with LIRR and federal safety standards. (Tr. 62.)

Coastal's transloading operations are integral to NYA's railroad transportation services. Coastal does not serve just NYA; Coastal serves several members of the public and intends to increase its services to the public via agreement with NYA. (Tr. 183–84.) Furthermore, NYA receives remuneration for every car Coastal loads. (Tr. 68.)

While the likelihood is high that Coastal is a rail carrier for purposes of ICCTA, the Court recognizes that certain

facts support Defendants' position that Coastal is not a rail carrier. For instance, NYA acknowledges that it is responsible for cars only when they are coupled to the railroad's locomotive. (Tr. 119.) And certainly, Coastal may find it in its best interest to apply to the STB for licensing or an exemption from licensing. But as stated earlier, this Court need not find with "absolute certainty" that Coastal is a rail carrier under ICCTA. <u>Wali</u>, 754 F.2d at 1025. All this Court needs to find is that the Plaintiffs have more than a "fifty percent" chance of success on the merits of their claims. <u>Id</u>. Given that this Court finds Coastal provides transportation as defined under ICCTA and several facts support Coastal's rail carrier status, this Court finds the Plaintiffs have met their burden of probable success on the merits and injunctive relief is warranted.

As for Defendants' argument that Coastal conducts more than transloading operations at the Farmingdale facility, this Court rejects that argument because Defendants have pointed to nothing in the record that supports their position. Defendants' last and final objection is that the Magistrate should not have <u>sua sponte</u> raised the equitable estoppel considerations in favor of Plaintiffs. This Court finds it unnecessary to address this final objection in light of the fact that Plaintiffs have met their burden for a preliminary injunction.

CONCLUSION

In accordance with the foregoing, the Court adopts Magistrate Judge E. Thomas Boyle's Report and Recommendation. The Court preliminarily enjoins the Town from enforcing its Stop Work Order against Plaintiffs until resolution of this matter.


SO ORDERED.


/s/ JOANNA SEYBERT

Joanna Seybert, U.S.D.J.


Dated:    Central Islip, New York
          January 31, 2006